DAUGHTREY, J., delivered the opinion of the court, in which ROGERS, J., joined. KETHLEDGE, J. (pp. 748-52), delivered a separate dissenting opinion.
OPINION
MARTHA CRAIG DAUGHTREY, Circuit Judge.
The Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, provides, in pertinent part, that “a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.... ” 29 U.S.C. § 1104(a)(1). In this putative class action appeal, plaintiff Anthony De-Luca and defendant Blue Cross Blue Shield of Michigan (BCBSM) agree that, at least for certain purposes, BCBSM served in a fiduciary capacity for a welfare benefit plan self-funded by Flagstar Bank for its employees and their families. De-Luca contends that BCBSM’s fiduciary status should have prevented it from engaging in contract negotiations with various hospitals that would ultimately raise the costs that Flagstar Plan participants were required to pay for hospitalization. The district court disagreed with the plaintiffs assessment of BCBSM’s dealings, holding that BCBSM was not acting as a fiduciary when negotiating system-wide payment schedules for the various levels of its health insurance coverage, and granted summary judgment for the defendant.
On appeal, DeLuca insists that the district court erred both in failing to hold that BCBSM functioned as a fiduciary under 29 U.S.C. § 1002(21)(A) and in failing to interpret the “broad language” of 29 U.S.C. § 1106(b) to impose fiduciary status on BCBSM in virtually all its business dealings. DeLuca also faults the district court *745 for making erroneous factual findings in BCBSM’s favor to support the court’s grant of summary judgment. We conclude that the district court determined correctly that BCBSM was not acting in a fiduciary capacity in negotiating hospital reimbursement rates and that there was no genuine dispute of material fact that would prevent entry of summary judgment.

FACTUAL AND PROCEDURAL BACKGROUND

BCBSM is a non-profit health care corporation that provides a number of health care services to employers and individuals. It offers three forms of health-care coverage: a traditional open-access plan, a preferred provider (PPO) plan, and a health maintenance organization (HMO) that BCBSM operates through a subsidiary, Blue Care Network. In many cases, BCBSM offers insured health-care coverage, for which an employer or individual pays a fixed premium and BCBSM bears the risk that actual expenses will exceed that premium. BCBSM also administers self-insured plans, providing services for a fee, and the plan then reimburses BCBSM for actual medical expenses. In that case, the plan bears the risk that medical expenses will exceed expectations. For each of its coverage options, BCBSM negotiates rates with Michigan health-care providers such as doctors and hospitals. There are separate rates for each of its three coverage options — the traditional plan, the PPO plan, and the HMO — but rates are standard within each category. BCBSM’s status as a large purchaser of health-care services allows it to negotiate favorable rates, and those favorable rates enable BCBSM to offer competitive pricing for them insured plans and to attract customers for their self-insured plans.
Flagstar Bank has long maintained a self-insured health benefit plan for its employees. In January 1996, Flagstar Bank entered into a contract with BCBSM, under which BCBSM agreed to provide claims-processing and other administrative services for the Flagstar Plan in return for a fee. The agreement stated:
BCBSM shall administer Enrollees’ health care Coverage(s) in accordance with BCBSM’s standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to [Flagstar Bank], and this Contract .... The responsibilities of BCBSM pursuant to this Contract are limited to providing administrative services for the processing and payment of claims.
The contract also specified that “BCBSM will process and pay, and [Flagstar Bank] will reimburse BCBSM for[,] all Amounts Billed related to Enrollees’ claims incurred during the Term(s) of this Contract.” Flagstar Bank and BCBSM renewed the contract each year preceding the filing date of the present action. In 2003, BCBSM and Flagstar Bank entered into a “business associate addendum” to the administrative services contract, one goal of which was “to comply with applicable requirements of ... the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations.” The addendum provided that BCBSM was responsible for “[establishing, arranging, and maintaining provider networks, including managed care point-of-service, preferred provider, and traditional networks through contractual arrangements with preferred participating hospitals, physicians, and other health care providers and with other Health Plans within designated service areas.”
Prior to 2004, the rates paid by BCBSM’s traditional and PPO plans were lower than the HMO rates for many *746 health-care providers. Beginning around 2004, in an effort to increase the HMO’s competitiveness and to simplify pricing structures, BCBSM negotiated a series of letters of understanding with various hospitals that altered these preexisting rate agreements. Typically, these agreements were structured to equalize the rates paid by the HMO with those paid by the PPO plan. BCBSM agreed to make the rate adjustments budget-neutral for the healthcare providers by increasing the PPO and traditional plan rates to make up for the decrease in the HMO rates. Some of these rate adjustments were retroactive to the beginning of the year in which they were negotiated.
DeLuca, a practicing attorney in Grosse Point Park, Michigan, was a beneficiary of the Flagstar Bank Group Health Plan through his wife’s participation as a Flags-tar Bank employee. In 2006, he filed the present action against BCBSM alleging that BCBSM violated its duties as a fiduciary under two provisions of ERISA, 29 U.S.C. § 1104 and § 1106(b), by agreeing to increase its traditional and PPO plan rates in exchange for decreases in the HMO rates. After the completion of discovery, the district court granted BCBSM’s motion for summary judgment, concluding that BCBSM was not acting as a fiduciary for the Flagstar Plan when it negotiated the rate adjustments. DeLuca now appeals, arguing that BCBSM was indeed acting as an ERISA fiduciary under 29 U.S.C. § 1104 when it negotiated the rate changes and, alternatively, that acting in a fiduciary capacity is not a required element of a liability claim under the “other capacity” provision in 29 U.S.C. § 1106(b)(2), as long as BCBSM simply had the status of a fiduciary.

DISCUSSION

As the Supreme Court has noted in Pegram v. Herdrich, 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000):
In general terms, fiduciary responsibility under ERISA is simply stated. The statute provides that fiduciaries shall discharge their duties with respect to a plan “solely in the interest of the participants and beneficiaries,” § 1104(a)(1), that is, “for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan,” § 1104(a)(1)(A).
Id. at 223-24, 120 S.Ct. 2143. The district court ruled that BCBSM did not violate 29 U.S.C. § 1104 because it was not acting as a fiduciary when negotiating the rate changes at issue in this case. We agree. Although ERISA has strict fiduciary-duty provisions, those standards apply only when an individual or entity is acting as a fiduciary, defined by 29 U.S.C. § 1002(21)(A) as follows:
[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
BCBSM acted in two capacities during the course of its business relationship with the Flagstar Plan. First, BCBSM acted as the administrator and claims-processing agent for the plan. The parties do not dispute that BCBSM acted as a fiduciary in this capacity by, for instance, making discretionary eligibility determinations. But a party is subject to fiduciary liability under ERISA only when the party “was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.” Pegram, 530 *747 U.S. at 226, 120 S.Ct. 2143. For purposes of this ease, therefore, BCBSM’s liability under 29 U.S.C. § 1104 thus depends on whether BCBSM was a fiduciary in its second capacity: as a distributor of healthcare services, negotiating discounted rates for such services and passing the savings along to Flagstar Bank.
We conclude, as did the district court, that BCBSM was not acting as a fiduciary when it negotiated the challenged rate changes, principally because those business dealings were not directly associated with the benefits plan at issue here but were generally applicable to a broad range of health-care consumers. The Supreme Court has recognized that ERISA “defines ‘fiduciary’ not in terms of formal trusteeship, but in functional terms of control and authority over [a] plan.” Mertens v. Hewitt Assocs., 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); see also Smith v. Provident Bank, 170 F.3d 609, 613 (6th Cir.1999) (“the definition of a fiduciary under ERISA is a functional one, is intended to be broader than the common law definition, and does not turn on formal designations such as who is the trustee”). As a result, in determining liability for an alleged breach of fiduciary duty in an ERISA ease, the courts “must examine the conduct at issue to determine whether it constitutes ‘management’ or ‘administration’ of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary standards.” Hunter v. Caliber Sys., Inc., 220 F.3d 702, 718 (6th Cir.2000) (emphasis added) (internal quotation marks and alterations omitted) (citing Sengpiel v. B.F. Goodrich Co., 156 F.3d 660, 665 (6th Cir.1998)). In this case, the “conduct at issue” clearly falls into the latter category, “a business decision that has an effect on an ERISA plan not subject to fiduciary standards.”
Furthermore, a contrary analysis — one saddling BCBSM with the fiduciary obligation to negotiate Flagstar-Plan-specific rates — would be self-defeating. The financial advantage underlying BCBSM’s rate negotiations arises from the market power that BCBSM has as a large purchaser of health-care services. BCBSM is continuously in the process of re-negotiating prices for its three health-care coverage options and, thus, must continuously determine how much of that market power to allocate to achieving discounted prices for each of these options. If, however, BCBSM would be required to negotiate solely on a plan-by-plan basis, as a practical matter its economic advantage in the market would be destroyed, damaging its ability to do business on a system-wide basis, ultimately to the Flagstar Plan beneficiaries’ disadvantage.
DeLuca suggests two additional bases on which we might determine that BCBSM acted as a fiduciary when negotiating the rate changes, neither of which we find persuasive. First, DeLuca suggests that it is not proper in this case to consider BCBSM’s claims-processing and rate-negotiating roles separately. But we are required to do so under Pegram. See 530 U.S. at 226, 120 S.Ct. 2143. Second, De-Luca argues that BCBSM was acting as a fiduciary when it negotiated the rate changes because it “exercise[d] any authority or control respecting management or disposition of [plan] assets.” 29 U.S.C. § 1002(21)(A). Even if BCBSM did have authority or control respecting plan assets, this argument is also refuted by Pegram. As previously noted, that opinion holds that liability for a breach of fiduciary duty can occur only when a party “was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.” Pegram, 530 U.S. at 226,120 S.Ct. 2143. DeLuca’s argument is *748 not that BCBSM unwisely invested, wrongly appropriated, or otherwise squandered plan assets under its authority or control. Instead, the action subject to complaint in this case is BCBSM’s negotiation of rates. Regardless of whether BCBSM exercised discretionary authority or control over plan assets in some other contexts, the challenged rate negotiations were not an exercise of such authority or control. BCBSM thus did not act as a fiduciary when negotiating the rate changes.
BCBSM also did not engage in prohibited transactions in violation of 29 U.S.C. § 1106(b)(2). That section provides, “A fiduciary with respect to a plan shall not ... in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries.” DeLuca’s argument, as we understand it, is that the terminology “in any other capacity” imposes liability on a fiduciary even when not acting in a fiduciary capacity, at least with regard to those activities prohibited by section 1106. Such an interpretation, however, flies in the face of our holding that, “by its own terms, § 1106 applies only to those who act in a fiduciary capacity.” Hunter, 220 F.8d at 724. Because BCBSM was not acting in a fiduciary capacity when it negotiated the rate changes at issue in this case, BCBSM did not violate § 1106(b)(2).
DeLuca also contends that in ruling favorably on BCBSM’s motion for summary judgment, the district court erroneously found facts adverse to DeLuca. Because we do not rely on any of the allegedly erroneous facts in reviewing the district court’s legal conclusions, we need not address DeLuca’s arguments on this point. In addition, we note that most of the allegedly disputed facts were based on conclusory statements by DeLuca, rather than on evidence in the record.

CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court.