In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-2361 & 10-2362

MELISSA J. REDDINGER and SCOTT LEFEBVRE,

*Plaintiffs-Appellants,*

*v.*

SENA SEVERANCE PAY PLAN and
NEWPAGE WISCONSIN SYSTEM, INC.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
Nos. 09 CV 119 & 09 CV 141—**William C. Griesbach**, *Chief Judge.*

ARGUED JANUARY 10, 2011—DECIDED FEBRUARY 19, 2013[*]

---

[*] NewPage filed for Chapter 11 bankruptcy in 2011. Pursuant to the bankruptcy automatic stay provision in 11 U.S.C. § 362, these proceedings were stayed, and a decision could not issue. SENA and NewPage informed us on February 4, 2013 that the bankruptcy has concluded, and so we issue our decision.

Before FLAUM and WILLIAMS, *Circuit Judges*, and
HERNDON, *District Judge.***

WILLIAMS, *Circuit Judge.*  Scott LeFebvre and Melissa
Reddinger maintain they should have received severance
benefits after they left the paper mill where they
both worked. However, the company's plan only pro-
vided for severance to persons whose employment was
involuntarily terminated. Although the company initially
offered LeFebvre and Reddinger a May termination
date when the mill had been set to close in the spring,
by the time they returned the requisite release forms,
the company had informed them that the mill would
be staying open longer and that their new termination
dates would be later in the year. Knowing all this,
LeFebvre and Reddinger still chose to leave the mill in
May. Their choice to do so despite the company's offer
that they stay longer meant their employment was not
involuntarily terminated, and the plan administrator's
decision to deny them severance was not arbitrary and
capricious. Therefore, we affirm the grant of summary
judgment in favor of the defendants.

## I. BACKGROUND

Stora Enso North America Corporation (SENA) owned
a paper mill in Niagara, Wisconsin, a city on the banks
of the Menominee River in the northeastern part of the

---

** Of the United States District Court for the Southern
District of Illinois, sitting by designation.

state. NewPage Wisconsin System, Inc. bought SENA in December 2007. A month later, NewPage informed Niagara mill employees that it was closing the mill with a likely shut-down date in late April. Many employees began looking for new employment, including Scott LeFebvre and Melissa Reddinger.

On March 10 and 12, 2008, respectively, LeFebvre and Reddinger received letters from NewPage stating that their employment was being terminated effective May 2, 2008. The letters also stated that "in exchange for your agreement to release [NewPage] from any and all legal claims you may have concerning your employment or termination of that employment, [NewPage] will provide you with a severance package . . . . Please note that the benefits outlined in this package are contingent upon signing the Separation and Release Agreement." The enclosed Separation and Release Agreements provided for a "severance payment according to the Severance Pay Plan." The letters also included the severance pay-ment amounts that the employees would receive —$64,831 for LeFebvre if he executed the agreement within forty-five days, and $7227 for Reddinger, a newer employee, if she executed hers within twenty-one days.

Another NewPage salaried employee submitted his executed release agreement on March 20 and ultimately received severance. That same day, LeFebvre says that NewPage's Human Resources Administrator in-formed him the company was no longer accepting release agreements.

On March 24, about two weeks after it sent the letters, the company held meetings informing Niagara em-

ployees that it had decided to keep the plant open longer, until October, to fill customer orders. This news came as a surprise to LeFebvre and Reddinger. Both had been in talks with other companies that eventually led to job offers, but both still wanted to receive severance from NewPage. Reddinger spoke with the Niagara mill manager on March 24 and asked to be allowed to submit her signed release agreement that day. The manager responded that the company was no longer accepting agreements that had not yet been signed. Nonetheless, the next day, March 25, LeFebvre and Reddinger signed and submitted the release and separation agreements they had received two weeks earlier. When they later asked whether the company would pay them severance benefits, they were told it would not.

At the end of March, the company gave salaried employees including LeFebvre and Reddinger written notice of the extended mill closure date, another severance offer, and an additional retention bonus offer for those who stayed until the mill was to close in October. The new letters sent on March 27 stated in part: "You can expect a new Separation & Release Agreement to be sent prior to the mill closure date. The severance will be paid to you at the new closure date under the same terms and conditions and with new release dates. . . . As an incentive to retain you through the new closure, we will provide all salaried . . . employees with a retention bonus that will pay you 15% of your annual base salary if you stay with the mill until October 1, 2008, or until the mill closure date, whichever comes sooner . . . ."

LeFebvre and Reddinger both stopped working at the mill on May 2 and started new jobs. The mill continued to operate. After leaving the mill and not receiving any severance, LeFebvre and Reddinger requested it from the SENA Severance Pay Plan. The plan administrator concluded that the two had voluntarily terminated their employment and for that reason denied their requests. After their appeals were denied, LeFebvre and Reddinger each filed suit in federal court invoking the Employee Retirement Income Security Act of 1974 (ERISA) and various state-law theories. The district court granted the plan's motions for summary judgment, and we consolidated LeFebvre's and Reddinger's cases on appeal.

## II.  ANALYSIS

LeFebvre and Reddinger maintain they are entitled to severance payments under the terms of the Separation and Release Agreement that they submitted on March 25. Our review of the district court's grant of summary judgment considers the evidence in the light most favorable to LeFebvre and Reddinger, since they were the non-moving parties. *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 192 (7th Cir. 2011). Summary judgment is appropriate if the record establishes that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a).

### A.  Standard of Review

We begin with our standard of review. The plaintiffs contend that we should review de novo the denial of

their request for severance. When, like here, a wel-
fare benefit plan within the meaning of ERISA gives
the administrator discretion to interpret the plan provi-
sions or determine eligibility, our review of a challenged
denial of benefits asks whether the plan administrator's
decision was arbitrary and capricious. *Wetzler v. Ill.
CPA Soc. & Found. Ret. Income Plan*, 586 F.3d 1053, 1057
(7th Cir. 2009).

The plaintiffs argue this standard should not apply
because NewPage had a "conflict of interest," and
they argue that NewPage was trying to avoid paying
severance in order to conserve its corporate assets. The
record supports the opposite. NewPage wanted to con-
tinue employing LeFebvre and Reddinger until the
mill closed in October. It offered to pay them severance
upon termination after the mill closed, and that
severance amount would have been even higher than
had they stopped working in May since the severance
formula was based upon length of employment.
NewPage also offered LeFebvre and Reddinger an addi-
tional retention bonus if they stayed at the mill through
October. The company would have been out more
money had they stayed.

The plaintiffs also argue for a de novo standard of
review because they say the "true decision" to deny
benefits was made not by the plan administrator, but by
the company in March. But there is no evidence that the
decision to keep the mill open longer was in any way
motivated by a desire to avoid paying severance to em-
ployees like LeFebvre and Reddinger. The company

promised, and ultimately paid, severance to salaried employees who remained with the company until the mill closed. The evidence in the record supports a conclusion only that the company's reason for keeping the mill open longer was to fill existing orders and to keep it open to make it more attractive to potential buyers. NewPage obviously needed employees to operate the mill, and so it delayed many employee termination dates. The company's business decision to keep the mill open longer does not mean we review the severance denial de novo. Our review of the plan administrator's denial asks only whether that decision was arbitrary and capricious.

### B. Denial of Severance Benefits

The plaintiffs contend that they have been wrongfully denied benefits owed to them under an ERISA plan in violation of 29 U.S.C. § 1132(a)(1)(B). The SENA Severance Pay Plan is a welfare benefit plan under ERISA. NewPage continued to administer the plan after it acquired SENA in December 2007. We look to the SENA Severance Pay Plan and to how it detailed severance eligibility to ascertain whether the plan administrator's determination that the plaintiffs were ineligible for severance was arbitrary and capricious. *See James v. Gen. Motors Corp.*, 230 F.3d 315, 318 (7th Cir. 2000).

The Plan's stated purpose is "to provide severance pay to eligible employees of the Company whose employment is involuntarily terminated due to a reduction in force, reorganization, business necessity or economic

conditions." The Plan's provisions state that full-time employees whose employment is "involuntarily terminated" due to business necessity or other reasons are participants in the plan and eligible for severance pay. The Plan specifically provides that "[e]mployees who voluntarily terminate their employment with an Employer by resignation or otherwise . . . prior to being discharged by an Employer" are not participants in the plan and are not eligible for severance under the Plan. The Plan further states that no severance "will be paid or offered" to an eligible employee until the employee has executed a release of claims form releasing the employee's then-existing rights and legal claims against the employer.

So, to receive severance under the terms of the SENA Severance Pay Plan, LeFebvre and Reddinger needed to execute a release agreement and be involuntarily terminated. The plan administrator's conclusion that neither employee had been "involuntarily" discharged was not arbitrary and capricious. Although the company initially told LeFebvre and Reddinger their jobs would end in May, it informed them two weeks later that their employment would continue until October. Knowing that, LeFebvre and Reddinger made the choice to stop working at the mill in May. They did so voluntarily, and they did so after being informed that even if they returned the initial severance documents they would not receive severance pay if they left in May.

That NewPage did not adjust all its employees' end dates after the initial letter does not make the plan administra-

tor's decision arbitrary and capricious. Bob DeMay, to whom the plaintiffs point, received severance from the company. But DeMay signed and returned his severance agreement before the March 24 announcement that the mill would stay open longer, and the company did not change his termination date.

The plaintiffs also argue that the letters they received in early March created a group of employees who were now beneficiaries of the SENA Severance Pay Plan and that the company had no power to revoke severance pay because the pay was for the sole interest of plan beneficiaries. Simply offering the potential for severance did not make all employees "beneficiaries" who were entitled to severance under ERISA, however, as the Plan only authorized severance for persons who were involuntarily terminated. The plaintiffs stopped working in May of their own accord, and their termination was not involuntary. As a result, the plan administrator's decision to deny LeFebvre and Reddinger severance pay was not an arbitrary and capricious denial of benefits under 29 U.S.C. § 1132(a)(1)(B).

## C. Breach of Fiduciary Duty

LeFebvre and Reddinger also argue that the company breached the duty ERISA fiduciaries have to discharge "duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i). They argue that the true nature of the determination that

they had voluntarily terminated their employment was to advance the employer's interest. In support of this argument, they point to the mill's initial announcement to employees that it would close in late April, its notice to many employees of a May 2 termination date, and its acknowledgment that the plaintiffs were not granted severance because the company wanted them to continue effectively operating the mill. From these facts, the plaintiffs conclude that the company promoted its interests ahead of the plaintiffs' interests and breached the fiduciary duty imposed by ERISA.

"In every case charging a breach of ERISA fiduciary duty, . . ., the threshold question is not whether the actions of some person employed to provide services under the plan adversely affected a plan beneficiary's interest, but whether the person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). A person "is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority . . . respecting management of such plan . . ., (ii) he renders investment advice . . ., or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). Although NewPage was acting as a fiduciary when it administered the Plan, its decisions about when to close the mill were clearly made as business decisions, not as ones made in an ERISA fiduciary role. *See Varity Corp. v. Howe*, 516 U.S. 489, 527-28 (1996). There is no evidence that its business decision to keep the mill open later was in any way motivated by

a desire to avoid its obligations under the SENA Severance Pay Plan. The company also never misled its employees about the terms of the Plan. *See James*, 230 F.3d at 318. There was no breach of fiduciary duty cognizable under ERISA in this case.

### D. Claims Under State Law

The plaintiffs also maintain their state-law claims for breach of contract and estoppel should proceed. We disagree. First, "ERISA includes expansive pre-emption provisions, which are intended to ensure that employee benefit plan regulation would be exclusively a federal concern." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (citation omitted). Even if ERISA did not preempt the state-law claims, they would not succeed. LeFebvre and Reddinger first argue that NewPage breached a contract with them. They maintain that they executed and returned the release agreement within the time specified in the letters they received in early March, and that neither the plan nor the agreement contained any other relevant conditions. But it is black-letter law that an offer can be revoked any time before acceptance. *See, e.g., Kocinski v. Home Ins. Co.*, 452 N.W.2d 360, 367 (Wis. 1990) (finding that offer including release of claims was revoked and therefore no contract was formed). NewPage informed its Niagara mill employees on March 24 that it would not accept any more Separation Agreements because the mill would stay open longer. And when Reddinger inquired whether she could still submit her signed agreement, she was told "no." The company

revoked its offer before LeFebvre and Reddinger accepted it, and no contract was formed.

LeFebvre and Reddinger next contend their claim for promissory estoppel under Wisconsin state law has merit. Although ERISA includes expansive preemption provisions, we have noted that in some instances whether ERISA preempts state-law promissory estoppel claims can be a close question. *Sembos v. Philips Components*, 376 F.3d 696, 703 (7th Cir. 2004). Here, summary judgment on the promissory estoppel claim was proper even if ERISA did not preempt it.

Under Wisconsin law, a plaintiff succeeds on a promissory estoppel claim if: (1) a promise is made where the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) the promise induced such action or forbearance; and (3) injustice can only be avoided by enforcement of the promise. *Hoffman v. Red Owl Stores, Inc.*, 133 N.W.2d 267, 275 (Wis. 1965); *McLellan v. Charly*, 758 N.W.2d 94, 107-08 (Wis. Ct. App. 2008). LeFebvre and Reddinger contend that they were promised in writing in letters dated March 10 and 12, respectively, that they would be discharged on May 2. They maintain they acted in reliance on this promise to their detriment, as they stopped working at the mill on May 2 yet did not receive the severance discussed in the letters.

Thinking they were losing their jobs soon, LeFebvre and Reddinger understandably began looking for new jobs after they received the letters. The Plan, however,

makes explicitly clear that the letters giving a May 2 termination date were not enough to make LeFebvre and Reddinger entitled to severance. The Plan clearly states it does not offer severance until an employee signs the release: "No severance benefits will be paid *or offered* to an eligible employee *until the employees has executed a Company-approved 'release of claims' form* releasing all of the employee's then existing rights and legal claims against the Employers." (emphases added). And the one-page March 10 and 12 letters made that explicitly clear too, stating in a stand-alone one-sentence paragraph: "Please note that the benefits outlined in this package are contingent upon signing the Separation and Release Agreement."

The timing of the events demonstrates that the claim of estoppel based on the March 10 and 12 letters cannot succeed. By the time LeFebvre and Reddinger executed and returned their releases, the offer of severance with a May 2 termination date had been revoked. And although they suggest they accepted new jobs in reliance on the March 10 and 12 letters, it was not until *after* the March 24 announcement that the company would be staying open longer and that termination dates were no longer May 2 that they accepted new employment. Both also received a letter on March 27, well before they stopped working at the mill on May 2, that made clear in writing that new employment release dates were coming and that severance would be paid at the new mill closure date. Moreover, Reddinger testified in her deposition that she left when she did because she was pregnant and wanted to be in a new job by October, while LeFebvre testified that he also knew

that the mill wanted him to keep working after May 2 but that he chose to leave because he had had enough.

It is true that after the announcement that employment at the mill would continue past May 2, some mill employees certainly faced a difficult choice between leaving the mill to pursue the employment offers they had obtained in a small town or staying until the mill closed to collect severance. LeFebvre and Reddinger chose to accept new employment instead of continuing to work at the mill, an understandable decision. As relevant here, though, when they decided to stop working on May 2, they could not have reasonably believed that they would receive severance. *See McLellan*, 758 N.W.2d at 109 (rejecting promissory estoppel argument where plaintiff could not reasonably believe he had valid offer in light of written agreement to the contrary); *Dunn v. Milwaukee Cnty.*, 693 N.W.2d 82, 89 (Wis. Ct. App. 2005) (declining to grant equitable relief of promissory estoppel for plaintiffs' actions in 2003 where promise had been withdrawn in 2002). In these circumstances the promissory estoppel claim cannot succeed. To the extent the plaintiffs are still pursuing an ERISA estoppel claim, it similarly fails for lack of reasonable reliance. *See Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 636 (7th Cir. 2007).

## III. CONCLUSION

The judgment of the district court is AFFIRMED.