T.C. Memo. 2013-288

UNITED STATES TAX COURT

PEKING INVESTMENT FUND, LLC, PEKING INVESTMENT HOLDINGS
LLC, TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12772-09.                     Filed December 23, 2013.

Participant, T, acting on behalf of Peking Investment Fund, LLC (PIF), as PIF's tax matters partner (TMP), executed a series of consents extending the I.R.C. sec. 6229(a) periods of limitations for making assessments (periods of limitations) with respect to PIF's 2001-04 taxable years (years in issue) until Dec. 31, 2008. T executed those consents pursuant to his appointment as PIF's TMP by H, acting on behalf of CMI, PIF's member-manager and its then TMP. R's agent auditing PIF's returns for the years in issue was notified of that appointment, and he solicited and accepted the consents in the belief that they were properly executed by T as PIF's new TMP. T and his wife (Ts) also executed consents extending to that same date the periods of limitations for making assessments against them for their 2001-03 taxable years, including assessments attributable to items of a partnership.

[*2]   T moves for summary judgment that the consents he executed on behalf of PIF are invalid and that the FPAA, issued on Dec. 30, 2008, is, therefore, untimely, on the ground that, as a nonmanaging member of PIF, he was not qualified to be PIF's TMP and not otherwise authorized to sign the consents.  See I.R.C. sec. 6229(b)(1)(B).  For 2001, T argues in the alternative that the initial consent, properly executed by H, on behalf of PIF's then TMP, CMI, was executed after the period of limitations for 2001 had expired.  As an alternative basis for his motion, T argues that, because R had opposed T's motion to elect to participate in this case on the ground that T was never PIF's TMP, R is both judicially and equitably estopped from alleging that any of the foregoing consents are valid extensions of the periods of limitations.  R argues that (1) PIF's appointment of T as PIF's TMP effectively authorized him to execute the consents on behalf of PIF, (2) in the alternative, CMI's resignation and appointment of T as PIF's TMP was ineffective so that CMI remained PIF's TMP, and T, as CMI's vice president, was authorized to execute the consents on CMI's behalf, (3) for 2001, the initial consent was timely executed by H, and (4) the doctrines of judicial and equitable estoppel are inapplicable to invalidate the foregoing consents.  R moves for summary judgment that the consents executed by the Ts for 2001-03, and by T for 2004, are valid with respect to them individually so that the FPAA is timely with respect to T's distributive share of PIF's partnership items for the years in issue.

1.  Held:  T's motion for summary judgment that the initial consent for PIF's 2001 taxable year was untimely will be denied because there remains a genuine dispute as to material facts.

2.  Held, further, R is not barred by the doctrines of judicial and/or equitable estoppel from relying on the foregoing consents.

3.  Held, further, the consents that T executed on behalf of PIF extended the periods of limitations beyond the issuance of the FPAA on the ground that (1) T's appointment as PIF's TMP effectively authorized him to execute the consents pursuant to I.R.C. sec. 6229(b)(1)(B) and, alternatively, (2) T is estopped from denying his

[*3] authority, as PIF's ostensible TMP, to execute consents on PIF's behalf for the years in issue.

4. Held, further, R is not estopped by any misconduct from relying upon the consents that the Ts executed for 2001 to extend the period of limitations for that year beyond the issuance of the FPAA.

Roy E. Hahn (an officer), for petitioner.

Laura L. Gavioli, Denise M. Mudigere, and Michael Todd Welty, for

participant, Li Chien Tsai.

Gregory Michael Hahn, Chong S. Hong, Connor J. Moran, and James P.

Thurston, for respondent.

MEMORANDUM OPINION

HALPERN, Judge: Both participant Li Chien Tsai (participant or Mr. Tsai),

on behalf of petitioner, and respondent have moved for summary judgment

(participant's motion, respondent's cross-motion, or, together, motions). Each

party objects to the other's motion.

**[\*4]**   Participant's motion seeks our determination that the section 6229(a)[1] three-year periods of limitations on assessment (periods of limitations) with respect to partnership items associated with Peking Investment Fund, LLC's (PIF) 2001-04 taxable years (years in issue) expired before respondent issued the notice of final partnership administrative adjustment (FPAA) covering those years.[2]  Specifically, the issue, as regards participant's motion, is whether, pursuant to section 6229(b)(1)(B),[3] Forms 872-P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items, covering the years in issue, executed by participant, who signed as PIF's tax matters partner (TMP), effectively extended the periods of limitations for those years for all of PIF's partners beyond the

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]PIF filed two returns for 2001:  one for the short year ending December 24, 2001, and one for the short year ending December 31, 2001.  The FPAA failed to include PIF's short year ending December 24, 2001, and respondent concedes that we lack jurisdiction over that year.  Thus, except as otherwise specifically stated, any reference herein to PIF's 2001 taxable year is a reference to the short year ending December 31, 2001.

[3]Sec. 6229(b)(1)(B) provides that the period of limitations may be extended "with respect to all partners, by an agreement entered into by the Secretary and the tax matters partner (or any other person authorized by the partnership in writing to enter into such an agreement)".

[*5] issuance of the FPAA.  Participant argues that, because he was (1) ineligible to be PIF's TMP when he signed the Form 872-P consents and (2) not otherwise authorized to sign them, they were invalid and did not extend the periods of limitations pursuant to section 6229(b)(1)(B).  For 2001, there is a second issue: whether the first of the consents executed for 2001, properly executed by PIF's then TMP, was executed before the expiration of the period of limitations.

Respondent's cross-motion seeks a determination that the FPAA was timely issued with respect to participant and his wife, Debbie L. Tsai (together, Tsais), in regard to their 2001-03 taxable years and with respect to Mr. Tsai for his 2004 taxable year.  The issue is whether Forms 872-I, Consent to Extend the Time to Assess Tax As Well As Tax Attributable to Items of a Partnership, executed by the Tsais for 2001-03, effectively extended the periods of limitations with respect to deficiencies attributable to Mr. Tsai's distributive share of PIF's partnership items for those years beyond the issuance of the FPAA.  For 2004, the issue is whether Mr. Tsai's execution of Form 872-P consents for that year effectively extended the period of limitations applicable to him (as an indirect partner of PIF) and attributable to his distributive share of PIF's 2004 partnership items beyond the issuance of the FPAA.  For all four years, respondent premises his right to assess on section 6229(b)(1)(A), which provides that the period of limitations "may be

[*6] extended * * * with respect to any partner, by an agreement entered into by the Secretary and such partner * * * before the expiration of such period."  In response, participant argues that, for all four years, the doctrines of both judicial and equitable estoppel bar respondent from arguing that any agreement to extend the periods of limitations exists.  In addition, for 2004 participant argues that the Form 872-P consent he executed for that year is "facially invalid" and, therefore, ineffective to extend the period of limitations "as if it were a Form 872-I consent."

Because, for the reasons stated infra, we find, as a matter of law, that the Form 872-P consents that participant executed for PIF's 2002 and 2003 taxable years effectively extended the periods of limitations for those years with respect to all of PIF's partners pursuant to section 6229(b)(1)(B), the validity, pursuant to section 6229(b)(1)(A), of the Tsais' Form 872-I consents for 2002 and 2003, as they pertain to Mr. Tsai's distributive shares of PIF's partnership items for those years, becomes moot.  Similarly, because we find that the Form 872-P consent that participant executed for 2004 was valid with respect to all partners of PIF pursuant to section 6229(b)(1)(B), the issue of whether it was valid with respect to participant only, pursuant to section 6229(b)(1)(A), also becomes moot.

For 2001, for the reasons stated infra, we find that there remains a genuine dispute of material fact as to the date on which PIF filed its 2001 Form 1065, U.S.

**[*7]** Return of Partnership Income (2001 return). As a result, we are unable to resolve, by summary judgment, the timeliness, with respect to all of PIF's partners under section 6229(b)(1)(B), of the initial Form 872-P consent executed on behalf of PIF for 2001. Thus, the validity, pursuant to section 6229(b)(1)(A), of the Tsais' Form 872-I consent for 2001, as it pertains to Mr. Tsai's distributive share of PIF's partnership items for that year is not moot. Therefore, we will decide whether to grant summary judgment for respondent on that issue.

Background

Organization and Ownership of PIF

PIF was organized in 2001 as a Delaware limited liability company "for the primary purpose of making investments in distressed assets * * * in an effort to yield an above-average return * * * through * * * the restructuring and rehabilitation of such assets." During the years in issue, there were three members of PIF: Peking Investment Holdings, LLC (PIH), owned a 98% membership interest; Chenery Management, Inc. (CMI) (an S corporation within the meaning of section 1361(a)(1)), owned a 1% membership interest; and China Cinda, AMC, owned a 1% membership interest. PIH had five members, two of whom were Mr. Tsai, who held a 12.990589% membership interest, and CMI, which held a

[*8] .032396% membership interest.  Roy E. Hahn was president and participant was vice president of CMI during the years in issue.[4]

The PIF operating agreement (PIFOA) provides for the appointment of a manager to manage PIF's "business, property and affairs", and it appoints CMI as the "initial manager".  The PIFOA further provides that the manager serve "an indefinite term" until a majority in interest of the members designates "a replacement Manager or until the Manager shall either be unwilling or unable to continue."  The PIFOA also gives the manager the right to resign "at any time upon sixty (60) days' written notice to the Company."  The PIFOA designates CMI, as the initial manager, to be the TMP "to represent * * * [PIF] * * * in connection with all examinations of * * * [PIF's] affairs by tax authorities".

CMI's Resignation in Favor of Participant as TMP of PIF

Mr. Hahn, acting on behalf of CMI, PIF's manager/TMP, signed each of PIF's returns for the years in issue.  Subsequently, by letter dated March 30, 2006, addressed to Rafael Oliveras (Mr. Oliveras or agent), the IRS agent who audited PIF's returns for the years in issue, Mr. Hahn advised that "we [meaning CMI] have resigned as tax matters partner for all tax years for which we previously

---

[4]Mr. Hahn was also president of Chenery Associates, Inc. (later renamed Sussex Financial Enterprises, Inc.), which held a 43.302395% membership interest in PIH.

[*9] served as tax matters partner for * * * [PIF and PIH]." Mr. Hahn enclosed two copies of his (i.e., CMI's) formal "Resignation By Tax Matters Partner (TMP) Filed Pursuant to Reg. § 301.6231(a)(7)-1(i)". Mr. Hahn's letter states that participant will be the new TMP for purposes of dealing with Mr. Oliveras in connection with the PIF audit, and it gives participant's contact information. Mr. Hahn copied participant on both the letter and the enclosures. Thereafter, by fax dated April 5, 2006, participant advised Mr. Oliveras that CMI was sending him all of PIF's books and records and that, upon their receipt, he would "take on the role of tax matter [sic] partner of * * * [PIF] and * * * [would send Mr. Oliveras] a separate letter acknowledging my position as the tax matter [sic] partner." That letter was forthcoming by means of a fax to Mr. Oliveras dated October 11, 2006. After CMI's March 30, 2006, resignation as TMP and until December 2008, participant acted and was treated by respondent in connection with the audit of PIF as PIF's TMP. It was not until December 17, 2008, when the IRS TEFRA[5]

---

[5]The Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, established special procedures for auditing partnership returns whereby the return is subject to a single audit in which one partner acts for the partnership but all partners are bound by the results of the audit. The audit results may be contested in court in a unified proceeding the results of which are also binding on all partners. See Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts, para. 112.3.1, at S112-88-89 (Cum. Supp. No. 2, 2013).

[*10] coordinator reviewing the proposed FPAA to be mailed to PIF first raised the issue of participant's eligibility to be PIF's TMP, that his status as PIF's TMP became an issue.[6] Subsequently, on January 21, 2010 (in connection with this litigation), the Court granted PIH's motion to have itself appointed PIF's TMP.

PIF's Returns and the Consents To Extend the Time To Assess Tax Attributable to PIF

As discussed more fully infra, the parties disagree as to the date on which PIF's 2001 return was filed. Participant alleges that that return was timely filed on or before April 15, 2002. Respondent alleges a filing date of July 12, 2002. There is no dispute, however, that PIF's 2002-04 returns were timely filed on or before the April 15 filing due dates. Each of the returns listed a San Francisco, California address for PIF.

For 2001 and 2002, CMI, in the person of Mr. Hahn as PIF's TMP, executed Form 872-P consents, which extended the periods of limitations for 2001 to December 31, 2006, and, for 2002 to April 15, 2007. Mr. Hahn executed and

---

[6]In a December 31, 2008, exchange of emails, Mr. Oliveras sought information regarding the circumstances and authority by which Mr. Tsai became PIF's TMP, and Mr. Tsai responded that his "appointment as the TMP was a mutual verbal agreement between myself, a director of CMI and Roy Hahn, president of CMI." Respondent's subsequent failure to continue to treat Mr. Tsai as PIF's TMP would indicate respondent's nonacceptance of that explanation as describing a valid appointment of Mr. Tsai to that position.

**[*11]** mailed the Form 872-P consent for 2001 on June 6, 2005, and the consent for 2002 on January 23, 2006.  After participant's March 30, 2006, appointment as PIF's TMP, replacing CMI in that capacity, the agent forwarded to participant all subsequent requests for period of limitations extensions.  Participant signed all of the Form 872-P consents forwarded to him as PIF's TMP and returned them to the agent for IRS signature before the expiration of the previously executed consents. The last of the Form 872-P consents that both participant and respondent executed for each of the years in issue purported to extend the periods of limitations on assessment for those years to December 31, 2008.[7]

During 2005-07, the agent also timely requested and obtained from the Tsais a series of Form 872-I consents for their 2001-03 taxable years, the last of which extended the periods of limitations with respect to the Tsais, individually for those years (including tax, interest, and additions to tax attributable to partnership or affected items or computational adjustments within the meaning of section 6231(a)(3), (5), and (6)), until December 31, 2008.

---

[7]On November 20, 2008, participant, acting as PIF's TMP, signed Form 872-P consents extending the periods of limitations for the years in issue to December 31, 2009, but respondent never executed those consents and, therefore, they were ineffective to further extend the periods of limitations.  They have no application to this case.

- 12 -

[*12] On December 30, 2008, respondent sent, by certified mail, nine copies of the FPAA to various addresses, intending to serve PIF's TMP, its members, and participant. The FPAA generally denies loss deductions claimed by PIF for the years in issue and imposes penalties on the ground that the transactions giving rise to those losses were without business purpose and lacked economic substance.

Prior Motions and the Court's Prior Orders in This Case

On February 17, 2010, the Court filed respondent's motion for entry of decision based upon a settlement of this case entered into with PIH as PIF's TMP. On March 11, 2010, the Court filed Mr. Tsai's motion for leave to file a notice of election to participate in this case. Mr. Tsai signed the motion as PIF's TMP.[8] Mr. Tsai's motion was prompted, in large part, by his noninclusion in the settlement negotiations with Mr. Hahn, acting on behalf of PIH, and his opposition to the settlement. Respondent objected to Mr. Tsai's motion on the ground that his notice of election to participate was not timely filed and on the further ground that respondent would be prejudiced by the granting of Mr. Tsai's motion. In his response to respondent's objection to his motion, Mr. Tsai emphasized that, even though he had moved to China in July 2008, the agent continued to communicate

---

[8]Presumably, participant was unaware, at that time, of our January 21, 2010, order granting PIH's motion to substitute itself as PIF's TMP.

[*13] with him as PIF's TMP at his New York City mailing addresses until the issuance of the FPAA. He argued that, because he lacked knowledge of both the FPAA and respondent's earlier motion for entry of decision, he should be allowed to participate in the case despite his election to do so out of time. In his reply to that response, respondent alleged that he did mail copies of the FPAA to Mr. Tsai's New York addresses and that Mr. Tsai was made aware, by Mr. Hahn, of the proceedings in this case. Respondent also alleged that he was not required to serve a copy of his motion for entry of decision on Mr. Tsai because Mr. Tsai "was neither the TMP [of PIF] nor a participating partner."

Thereafter, on May 13, 2010, we ordered Mr. Tsai to file a status report relating to his right and preparedness to participate in litigating this case on behalf of PIF.

On July 12, 2010, Mr. Tsai filed his status report. In his declaration accompanying the status report, Mr. Tsai alleged that, in March 2006, he "properly notified the Respondent that * * * [he] was the new * * * [TMP for PIF]." He also alleged that when "[r]espondent issued the FPAA, Mr. Tsai was * * * [PIF's] TMP", and he confirmed that "respondent communicated with * * * [me in my] capacity as * * * [PIF's] TMP * * * up through December 2008." The status report itself argues for Mr. Tsai's participation in this case on the ground that his

[*14] "experience in investing in Chinese distressed assets is crucial to [an] understanding [of] the transactions at issue" and that "he has first-hand information as to the legitimacy * * * and the economic benefits such transactions provided." The status report concludes that Mr. Tsai must not be deprived "of his opportunity to challenge this unfair settlement and litigate the merits of this case. Accordingly, he must be entitled to participate in this action."

In his response to Mr. Tsai's status report, respondent defends his mailing of the FPAA to a "generic TMP" on the ground that "although Mr. Tsai represented himself to be the TMP of PIF, he was not legally eligible to be the TMP * * * because he held no interest in PIF and was not a member of PIF."

On November 10, 2010, we issued an order (November 10, 2010, order) requiring the parties and Mr. Tsai to file memorandums of law (MOLs) addressing "who is or has been" PIF's TMP, the extent to which the case must be dismissed because filed by or on behalf of an improper person, and the need, if any, to amend the caption. In the order, we observed that, after "PIF designated Mr. Tsai as its new TMP * * * [t]he revenue agent proceeded to deal with Mr. Tsai as PIF's TMP." We further observed:

> Apparently, Mr. Tsai was entitled to become the TMP of PIF because at the time of the designation he was a "member-manager" of PIH, see sec. 301.6231(a)(7)-2(b)(3), Proced. & Admin. Regs., and an indirect

[*15] member of PIF, see <u>Dionne v. Commissioner</u>, T.C. Memo. 1993-117 (holding that an indirect partner is treated as a partner under sec. 6231(a)(2)(B)), and PIH was a member-manager of PIF.

In his MOL in response to the November 10, 2010, order, respondent argued that, pursuant to section 301.6231(a)(7)-1, Proced. & Admin. Regs., Mr. Tsai was ineligible to be PIF's TMP and that CMI's purported resignation as TMP in favor of Mr. Tsai was "meaningless". In making that argument, respondent specifically rejected our conclusion in the November 10, 2010, order that Mr. Tsai's status as an indirect partner of PIF, through his interest as a member-manager in PIH, entitled him to become PIF's TMP.[9]

In his MOL in response to respondent's MOL, Mr. Tsai argued that his role was "crucial to a complete understanding of * * * [the case] given [that] Respondent treated him as TMP for two years and relied upon his authority to extend the statute of limitations." Mr. Tsai notes, however, that, assuming CMI continued as PIF's TMP after its purported resignation as such, "the FPAA was not timely issued because the Respondent does not have [a] validly executed * * * extension from an authorized PIF partner."

_____

[9]Rather, according to respondent, "because Mr. Tsai was never a member-manager of PIF, he was never and is not qualified to be PIF's TMP."

**[*16]** On May 5, 2011, we issued an order (May 5, 2011, order) granting Mr. Tsai's motion for leave to file a notice of election to participate in this case and denying respondent's earlier motion for entry of decision based upon his settlement negotiated with Mr. Hahn. In the May 5, 2011, order, we noted Mr. Tsai's desire to participate in the case in order "to prove that PIF realized real economic benefits from its involvement in the distressed asset program underlying this case and to prove that respondent's determination is wrong", and we further noted our reliance on Mr. Tsai's representations "to the Court, without contradiction by respondent, that he is prepared and financially able to litigate the merits of this case on behalf of PIF."

## Discussion

### I.    Summary Judgment

A summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits or declarations, if any, show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). A summary judgment may be made upon part of the legal issues in controversy. See Rule 121(a).

**[*17]** II.     Participant's Motion

    A.     Timeliness of the Initial Form 872-P Consent for 2001

        1.     Introduction

As noted supra, there are two issues concerning 2001:  (1) whether participant's execution of Form 872-P consents for that year on behalf of PIF were effective to extend the period of limitations to December 31, 2008 (an issue common to all of the years in issue), and (2) whether the first of those consents for 2001 (signed by Mr. Hahn who, by signing as president of CMI, PIF's then TMP, was admittedly authorized to sign the consent) was executed before the expiration of the period of limitations for 2001.  We will address issue (2) first because it is unique to 2001 and then address issue (1) in connection with our analysis of the validity of all of the Form 872-P consents that participant executed as PIF's TMP for the years in issue.

        2.     Analysis

On June 6, 2005, Mr. Hahn, on behalf of CMI, executed a Form 872-P consent to extend the period of limitations for 2001 to December 31, 2006.  If PIF timely filed its 2001 return on or before April 15, 2002, the foregoing extension, executed after the April 15, 2005, expiration of the period of limitations for 2001, would be invalid, as would all subsequent consents for 2001.

[*18] Participant argues that the evidence in the record raises a presumption, not rebutted by respondent, that PIF's 2001 return was timely filed on or before April 15, 2002, so that the June 6, 2005, consent, executed after the period of limitations had expired, is invalid. Participant relies upon his and Mr. Hahn's June 28, 2012, declarations that Mr. Hahn, on behalf of PIF, was in the practice of timely filing PIF's returns and of mailing its returns within three days of execution. He also notes that both Mr. Hahn and the return preparer signed all of PIF's returns, including the 2001 return, on or before the April 15 deadline.

Participant argues that his and Mr. Hahn's declarations furnish extrinsic evidence ("prima facie proof") of the timely filing of PIF's 2001 return and that "[r]espondent has not and cannot produce admissible evidence to establish the presence of a genuine factual dispute." Therefore, summary judgment in petitioner's favor on the limitations issue with respect to 2001 is justified. In that regard, participant notes that respondent is unable to provide either the filed 2001 return or the envelope in which it was mailed.

In support of his position, participant cites three cases holding that unrebutted, extrinsic evidence of timely mailing of a return is sufficient to justify a holding that the return was timely filed. See Anderson v. United States, 966 F.2d

[*19] 487 (9th Cir. 1992); <u>Kralstein v. Commissioner</u>, 38 T.C. 810 (1962); <u>Oppenheimer v. Commissioner</u>, 16 T.C. 515 (1951).

Both <u>Anderson</u> and <u>Kralstein</u> involved taxpayers who were found to have testified credibly (and, in <u>Anderson</u>, with corroborating testimony) that they did, in fact, timely mail the returns in question. In this case, neither participant nor Mr. Hahn has a personal recollection of the exact date on which PIF's 2001 return was filed. Both were able to state only that, "to the best of my knowledge", all of PIF's returns were timely executed and filed, and that CMI was in the practice of timely filing PIF's returns within a few days of execution. Therefore, <u>Anderson</u> and <u>Kralstein</u> are inapposite.

In <u>Oppenheimer</u>, however, we held that, despite the taxpayer's inability to "remember precisely that she personally mailed the return", her certainty that "she followed her usual method in sending it to the collector" coupled with the Commissioner's failure to retain the postmarked envelope in which it was mailed was sufficient for us to find "as a fact that the petitioner's return was timely filed." <u>Oppenheimer v. Commissioner</u>, 16 T.C. at 527-528. In essence, we found for the taxpayer on the basis of her testimony, unrebutted by the Commissioner. In this case, however, respondent has presented substantial evidence to rebut participant's evidence that the 2001 return was timely filed.

[*20] Although, as in <u>Oppenheimer</u>, respondent is unable to provide the original 2001 return or the original mailing envelope for that return, there exists credible evidence that, for 2001, PIF mailed to respondent a Form 8736, Application for Automatic Extension of Time To File U.S. Return for a Partnership, REMIC, or for Certain Trusts, on or about April 15, 2002, and its 2001 return on or about July 12, 2002.[10] Mr. Hahn, in a second declaration dated August 9, 2012, states that he reviewed PIF's 2001 tax files at respondent's counsel's request and found copies of (1) the Form 8736 for 2001, (2) a U.S. Postal Service (USPS) certified mail receipt dated April 15, 2002, with a handwritten IRS Ogden, Utah, address and a handwritten notation stating "Extension 8736 D", (3) a USPS form with a handwritten IRS Ogden, Utah, address and a stamp "IRS - OSC RECEIVED Ogden, UT", and (4) a letter from FedEx Express dated July 25, 2002, with a tracking number and the handwritten notation "Peking Inv Fund Form 1065 11/27/01-12/24/01 & 12/25/01-12/31/01." Mr. Hahn states that, to the best of his knowledge, the handwritten notations were by a former CMI employee with mailroom responsibilities and are, presumably, accurate. On the basis of that documentation obtained from PIF's 2001 tax files, Mr. Hahn concludes:

---

[10]A July 12, 2002, filing date for the 2001 return would mean that the initial Form 872-P consent for 2001, executed and mailed to respondent on June 6, 2005, was timely; i.e., executed within three years of the return filing date.

**[*21]** "Although I do not now have any personal recollection of the date that the PIF 2001 Tax Returns were mailed to the IRS, the documentation in the CMI files indicates that PIF mailed an extension on April 15, 2002 and mailed the Forms 1065 on July 11, 2002." Mr. Hahn further states: "It was not a regular practice of CMI to simultaneously mail both an extension of time to file and tax returns at the same time."

Participant acknowledges "the existence of a FedEx tracking slip which indicates that * * * [PIF] mailed a package to the Service on July 11, 2002", but argues, on the basis of a handwritten notation, "duplicate return", on an IRS transcript for PIF opposite a date of July 12, 2002, that PIF mailed a duplicate, not its original, return to respondent on July 11, 2002. In response to that claim, respondent has submitted the declaration of Laura J. Schmitz (Schmitz declaration) dated August 30, 2012. In her declaration, Ms. Schmitz identifies herself as "a TEFRA Coordinator with the * * * ('IRS') * * * since July 10, 2005" and, previously, "a Revenue Agent since September 18, 1994." On the basis of the above-described mailing documentation and her reading of IRS transcripts pertaining to PIF, Ms. Schmitz concludes that the filing extension applications were mailed on April 15, 2002, and received by the IRS on April 19, 2002. On the basis of the same evidence, she further concludes that respondent received and

[*22] filed original returns for the two short years ending in 2001 on July 12, 2002. She explains that the coding of PIF's return for the second 2001 short year as a "duplicate return" was made necessary by PIF's filing of returns for two tax years ending in the same month. She states that, in those circumstances, the IRS "cannot establish a separate tax module for each * * * [return] filed by the partnership. Rather * * * [it] will create only one tax module for both * * * returns." She further states that, because it cannot code two original returns in one "tax module", the IRS codes the later return as a "duplicate return", but that does not indicate that that return is not an originally filed return.

We find that respondent has presented substantial credible evidence that PIF did not file its 2001 return until July 12, 2002, and that that evidence is more than sufficient to show a "genuine dispute as to * * * [a] material fact", within the meaning of Rule 121(b), pertaining to the timeliness of the initial extension for 2001. Participant asks that we disregard Ms. Schmitz's declaration on the ground that it should have been furnished to him during discovery. Participant argues that he "has had no meaningful opportunity to examine and test the credibility of the evidence." But even if we were to disregard Ms. Schmitz's declaration, we would find that Mr. Hahn's declarations plus the documentary evidence of (1) an April 15, 2002, mailing of an application for a filing extension and (2) a July 12, 2002,

[*23] filing of the 2001 return are sufficient to raise a genuine issue of material fact regarding the date on which PIF filed its 2001 return. Moreover, should this case proceed to trial, participant will have ample opportunity to "examine and test the credibility" of Ms. Schmitz's evidence, either by deposition, pursuant to Rules 70 and 74, or at trial.

### 3. Conclusion

Participant's motion for summary judgment with respect to the timeliness of the initial Form 872-P consent for 2001 will be denied.

### B. Validity of the Form 872-P Consents That Participant Signed

### 1. The Parties' Arguments

Participant argues that, because he was not a member-manager of PIF, he was neither eligible to be (and, therefore, he was not) PIF's TMP nor was he otherwise properly authorized to extend the period of limitations for any of the years in issue. As a result, he argues that the Form 872-P consents that he executed for the years in issue did not pursuant to section 6229(b)(1)(B) extend the period of limitations to December 31, 2008, for any of those years and, as a result, the FPAA respondent issued on December 30, 2008, is untimely and invalid.

[*24] Participant cites the requirement of section 301.6231(a)(7)-1(b)(1), Proced. & Admin. Regs., that, unlike participant, a TMP must be a general partner at some time during the taxable year or a general partner when the designation is made. See also section 301.6231(a)(7)-2(a), Proced. & Admin. Regs., stating that "only a member-manager of an LLC is treated as a general partner" and section 301.6231(a)(7)-2(b)(3), Proced. & Admin. Regs., defining a "member-manager" as "a member of an LLC who, alone or together with others, is vested with the continuing exclusive authority to make the management decisions necessary to conduct the business for which the organization was formed."

In further support of his argument that he was not otherwise authorized to be PIF's TMP, participant states that PIF did not grant him authority to extend the period of limitations pursuant to the procedures specified in section 301.6229(b)-1, Proced. & Admin. Regs.

Participant also argues that he did not have express authority, under the PIFOA, to extend the period of limitations on assessment nor did he have apparent authority to do so under Delaware law. Therefore, he argues that cases allowing an individual other than the TMP to execute binding consents under those circumstances are inapposite.

[*25] Lastly, participant argues that, pursuant to the doctrines of both judicial and equitable estoppel, respondent may not assert "that Tsai either had authority to extend the statute [of limitations] or that an agreement to extend the statute existed."

Participant bases his argument for the application of judicial estoppel on what he considers to be respondent's improperly inconsistent positions regarding participant's status as PIF's TMP; i.e., respondent's treatment of participant as PIF's TMP for purposes of obtaining the Form 872-P consents followed by his assertion "[t]hroughout this proceeding" that participant's designation as TMP was invalid and that CMI has been PIF's TMP from its formation to the present. In participant's view: "Respondent intends to have it both ways. Respondent argues that Tsai's consents as TMP were valid because Respondent reasonably relied on Tsai's apparent authority, but Respondent also treated Tsai as having no apparent authority when attempting to settle the case."

Participant invokes the doctrine of equitable estoppel on the ground that he relied on good faith upon respondent's acceptance of him as PIF's TMP in signing the Form 872-P consents for the years in issue, thereby reasonably believing that his "execution of the extensions would result in good-faith efforts to resolve the case". Participant argues that the detriment to him was respondent's

[*26] (unsuccessful) attempt to exclude him from the settlement negotiations, which served as "an injustice" to him. He states that, had he "known that he was not authorized to execute the statute extensions, that * * * [respondent] considered his appointment [as TMP] invalid", and that he would be excluded from participating in the settlement negotiations, he "would not have granted * * * [respondent] the additional time for assessment or attempted to cooperate with * * * [respondent's] requests."

Respondent counters that Mr. Hahn's March 30, 2006, letter, whereby Mr. Hahn notified the agent of his resignation and appointment of participant as PIF's TMP "consisted of written words which, reasonably interpreted, caused Mr. Tsai and * * * [Revenue Agent] Oliveras to believe Mr. Tsai had the authority to sign the Form 872-P consents." Respondent concludes that the letter "granted Mr. Tsai actual authority to execute consents for PIF." In essence, respondent argues that participant did not execute the consents as TMP but, rather, as a "person authorized by the partnership in writing" to execute the consents, as provided for in section 6229(b)(1)(B). Alternatively, respondent argues that because CMI was the only member-manager of PIF it could not properly designate a substitute TMP and, therefore, was "deemed to be the TMP for the years at issue notwithstanding its purported resignation." Respondent then reasons that, as vice president of

[*27] CMI, participant was authorized to sign the consents on its behalf, and, by not objecting to its agent's (i.e., CMI's) action, PIF, in effect, ratified the execution of the Form 872-P consents.

Lastly, respondent rejects participant's claim that he has taken inconsistent positions in this case which merit the application of either judicial or equitable estoppel. In opposing application of the former, respondent argues that, in connection with both Mr. Tsai's motion to elect to participate and his motion for summary judgment, respondent "has consistently maintained the position that Mr. Tsai was not authorized to be PIF's TMP." In opposing application of the latter, respondent argues that participant's good-faith execution of the Form 872-P consents was not "a change of position to his detriment" because his failure to sign would have caused the immediate issuance of an FPAA leaving participant (and PIF) in the same position, and that, even if he did act to his detriment in signing the consents, those signings, followed by respondent's alleged noncommunication with participant during the course of this litigation is not the type of "affirmative misconduct" necessary to warrant the application of equitable estoppel against respondent.

**[*28]**     2.     Analysis

             a.     Application of Judicial and/or Equitable Estoppel

We agree with respondent that he is neither judicially nor equitably

estopped from opposing participant's summary judgment motion on the merits;

i.e., from arguing that the Form 872-P consents were properly executed and that

the FPAA was, therefore, timely issued.

The Supreme Court has described the doctrine of judicial estoppel as

follows:

> "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." Davis v. Wakelee, 156 U.S. 680, 689 (1895).  This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Pegram v. Herdrich, 530 U.S. 211, 227, n.8 (2000); * * *

> Although we have not had occasion to discuss the doctrine elaborately, other courts have uniformly recognized that its purpose is "to protect the integrity of the judicial process," Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (CA6 1982), by "prohibiting parties from deliberately changing positions according to the exigencies of the moment," United States v. McCaskey, 9 F.3d 368, 378 (CA5 1993).  * * *

[*29] <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749-750 (2001); <u>see also</u>

<u>Huddleston v. Commissioner</u>, 100 T.C. 17, 26 (1993) ("Judicial estoppel is an

equitable doctrine that prevents parties in subsequent judicial proceedings from

asserting positions contradictory to those they previously have affirmatively

persuaded a court to accept.").

We agree with respondent that he has not taken contradictory positions in

this case (nor does his position herein contradict a position sustained in any prior

case) regarding participant's status as PIF's TMP. In his submissions in opposition

to both Mr. Tsai's motion for leave to file a notice of election to participate and in

his motion for summary judgment, respondent has consistently argued that Mr.

Tsai was never PIF's TMP. Respondent's allegedly inconsistent or contradictory

treatment of participant as PIF's TMP, authorized to sign the Forms 872-P

consents on behalf of PIF, occurred during the audit, before the issuance of the

FPAA and the commencement of this case, and appears to have been based upon

both the agent's and participant's good-faith belief that participant had, in fact,

become PIF's TMP.

Respondent has made two alternative arguments during this litigation:

(1) participant's execution of the Form 872-P consents effectively extended the

period of limitations not because he was, in fact, PIF's TMP at the time but

[*30] because, as vice president of CMI, which never ceased to be the TMP (despite its purported resignation as such), he was authorized to execute the consents on CMI's behalf and (2) Mr. Hahn's March 30, 2006, resignation, on behalf of CMI, as PIF's TMP and designation of participant as the new TMP was, in substance, CMI's authorization of participant to execute the consents under section 6229(b)(1)(B). Neither argument contradicts a prior successful argument before this or any other court. Therefore, respondent is not judicially estopped from making those arguments.

Nor are respondent's arguments herein barred by the doctrine of equitable estoppel.

In McCorkle v. Commissioner, 124 T.C. 56, 68 (2005), we described the doctrine of equitable estoppel as follows:

> Equitable estoppel is a judicial doctrine that precludes a party from denying that party's own acts or representations that induce another to act to his or her detriment. E.g., Graff v. Commissioner, 74 T.C. 743, 761 (1980), affd. 673 F.2d 784 (5th Cir. 1982). It is to be applied against the Commissioner only with utmost caution and restraint. E.g., Hofstetter v. Commissioner, 98 T.C. 695, 700 (1992). The essential elements of estoppel are: (1) There must be a false representation or wrongful misleading silence; (2) the error must be in a statement of fact and not in an opinion or a statement of law; (3) the person claiming the benefits of estoppel must be ignorant of the true facts; and (4) he must be adversely affected by the acts or statements of the person against whom estoppel is claimed. E.g., Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977); * * *

[*31] Here, there was no "false representation or wrongful misleading silence" on respondent's part. It was participant who represented to respondent that he was PIF's TMP. Respondent, in the person of the agent, accepted participant's claim to that role in good faith until he was advised otherwise and, after some investigation, concluded that participant was not qualified to be PIF's TMP. Not until then did respondent stop treating participant as PIF's TMP. The circumstances do not warrant the application of equitable estoppel against respondent.[11]

---

[11]We note in passing that it is participant, not respondent, who has taken inconsistent positions regarding his status as PIF's TMP during the course of this litigation. In support of his motion to elect to participate in this case, participant argued that he became PIF's TMP in 2006 and continued to retain that status when the FPAA was issued. Participant further argued, in support of his motion, that his "experience in investing in Chinese distressed assets is crucial to understanding the transactions at issue" and that, therefore, he was both willing and able to litigate the case on behalf of PIF. In fact, participant's right, as a claimed former TMP, with knowledge of PIF's business, to litigate this case on the merits was a basis for our May 5, 2011, order granting participant's motion to elect to participate ("Mr. Tsai seeks to participate to prove that PIF realized real economic benefits from its involvement in the distressed asset program * * * and to prove that respondent's determination was wrong."). Participant's position in support of his summary judgment motion, whereby he (1) denies ever having been PIF's TMP and (2) seeks to bar respondent's proposed adjustments on procedural grounds, is clearly inconsistent with his representations in support of his prior motion.

**[*32]**        b.      <u>Respondent's Right To Rely Upon the Form 872-P</u>
<u>Consents that Participant Signed as Extending the Period</u>
<u>of Limitations</u>

           (1)     <u>Introduction</u>

In essence, participant argues that (1) he was ineligible to be, and therefore never was, PIF's TMP, (2) as a non-TMP, he was never granted actual authority to execute the Form 872-P extensions pursuant to section 6229(b)(1)(B) or pursuant to the PIFOA, and (3) he had no apparent authority to do so under Delaware law.

Respondent challenges only the second of participant's arguments, arguing that Mr. Hahn, as president and on behalf of CMI, PIF's sole member-manager, effectively authorized participant to execute the Form 872-P consents when he appointed participant to be PIF's TMP. Respondent argues, in the alternative, that "CMI's purported resignation did not terminate CMI's status as TMP, because CMI was the sole member-manager of PIF." He states: "Because CMI was the only member-manager and did not designate a proper substitute TMP, * * * [CMI] was deemed to be the TMP * * * notwithstanding its purported resignation." He then concludes that the Form 872-P consents were valid on the ground that participant, as vice president of CMI, had the authority to execute those forms on CMI's behalf and on the further ground that Mr. Hahn's subsequent silence constituted PIF's ratification of participant's execution of the forms on CMI's behalf.

[*33] Because we agree with respondent's first argument, we do not address his alternative argument.[12] We do, however, offer a separate, alternative basis for sustaining respondent's right to rely on the Form 872-P consents that is not directly addressed by either participant or respondent.

> (2)  Whether Participant Was Authorized To Execute the Form 872-P Extensions

> (a) Analysis

The March 30, 2006, letter that Mr. Hahn faxed to both Mr. Oliveras and participant specifically appoints participant to be PIF's TMP and states that CMI is "in the process of transitioning to Mr. Tsai the books and records of * * * [both PIF and PIH], including the files pertaining to the examinations and pending IDRs." Assuming that that notification did not succeed in substituting participant for CMI as PIF's TMP because participant was ineligible to be the TMP, the issue

_____

[12]Although we do not formally address respondent's alternative argument based, in part, upon CMI's alleged inability to resign as PIF's TMP, we note that that argument appears problematic in the light of sec. 301.6231(a)(7)-1(i), Proced. & Admin. Regs., which provides that a designated TMP "may resign at any time by a written statement to that effect." Moreover, even though participant was not a member-manager of PIF and, therefore, was ineligible to be treated as a general partner pursuant to sec. 301.6231(a)(7)-2(a), Proced. & Admin. Regs., he was, at least, an indirect limited partner in PIF pursuant to sec. 6231(a)(2)(B), and respondent had the power to select him, as such, to serve as TMP pursuant to sec. 6231(a)(7). See Computer Programs Lambda, Ltd. v. Commissioner, 90 T.C. 1124, 1127 (1988); see also Starlight Mine v. Commissioner, T.C. Memo. 1991-59, 1991 Tax Ct. Memo LEXIS 75, at *2.

**[*34]** is whether it effectively constituted a section 6229(b)(1)(B) authorization of participant to execute the Form 872-P consents on behalf of PIF.

Respondent cites our decision in Inv. Eng'rs, Ltd. v. Commissioner, T.C. Memo. 1994-255, 1994 WL 243487, aff'd without published opinion sub nom. Montelius v. Commissioner, 145 F.3d 1339 (9th Cir. 1998), in support of his argument that the March 30, 2006, letter gave participant the authority to execute the extensions on behalf of PIF. In that case, Investment Engineers, Ltd., was a limited partnership and Curtis was its sole general partner. Curtis decided he no longer wanted to be a general partner, and, in July 1984, without soliciting the approval of the limited partners, he executed a witnessed document purporting to admit Montelius, one of the limited partners, "as an additional general partner", intending to confer on him all the powers and responsibilities of a general partner. Id., 1994 WL 243487, at *2. Curtis and Montelius both believed that Montelius thereby became a general partner in the partnership. Curtis also believed that he was no longer a partner and that Montelius was the sole general partner. Montelius' actions as the general partner from July 1984 to 1993 included his signing the partnership's 1984 through 1991 Federal income tax returns as the general partner. In that capacity, he also dealt with the IRS agent auditing the partnership's 1982-84 returns. During 1985-87, he signed consents extending the

[*35] time for assessments relating to the audit years. He filed a protest, purportedly on behalf of all the partners, appealing the agent's findings, and he was the addressee (as the partnership's TMP) of the FPAA that was ultimately issued by the IRS.

The partnership argued that Montelius was never more than a limited partner without authority to execute the consents extending the periods of limitations on assessments and that, therefore, those consents were invalid and the FPAA was untimely and, therefore, void. We agreed with the Commissioner's argument that Montelius, through his purported admission as a general partner of the partnership, had written authorization to sign the consents. We determined that (1) Curtis, as general partner, had the authority to execute the consents and, therefore, the authority to delegate that power, (2) the intent of Curtis and Montelius was to shift to the latter broad authority with respect to partnership matters, including the authority to execute the consents, and (3) all but one of the limited partners acquiesced in that arrangement and that one did not express his objection until long after the expiration of the period of limitations. Id. at *6. We concluded that "[r]egardless of whether the written agreement changed Montelius' status to that of general partner, it authorized Montelius to assume the powers and responsibilities of a general partner" and that petitioner failed to prove that the

**[*36]** consent executed by Montelius "was invalid or that Curtis, as the general partner [and] agent of the Partnership, did not intend to authorize Montelius to execute [the] consents on behalf of the Partnership." We held that, under the partnership agreement, State law, and "the explicit grant of authority from Curtis, Montelius had the written authority to sign the consents, as required by section 6229(b)". Inv. Eng'rs, Ltd. v. Commissioner, 1994 WL 243487, at *7.

Our decision in Inv. Eng'rs, Ltd. was based, in large part, upon our prior decisions in Cambridge Research & Dev. Grp. v. Commissioner, 97 T.C. 287 (1991), and Amesbury Apartments, Ltd. v. Commissioner, 95 T.C. 227 (1990), and, specifically, our conclusion in each that there is nothing in section 6229(b)(1)(B) or the relevant legislative history to suggest a requirement that the writing authorizing one other than the TMP to sign consents extending the period of limitations is limited to a writing specifically referring to a consent agreement under section 6229(b)(1)(B). See Cambridge Research & Dev. Grp. v. Commissioner, 97 T.C. at 300-301; Amesbury Apartments, Ltd. v. Commissioner, 95 T.C. at 242-243; see also Bugaboo Timber Co. v. Commissioner, 101 T.C. 474, 488 (1993). Moreover, in Inv. Eng'rs, Ltd. v. Commissioner, 1994 WL 243487, at *5, we followed our holding in Cambridge Research & Dev. Grp. (which, in turn, followed Amesbury Apartments, Ltd.) that "'the use of the verbal auxiliary "may,"

[*37] rather than "shall," in the first sentence of section 301.6229(b)-1T, Temporary Proced. & Admin. Regs., * * * establishes that the procedures specified in the regulation [for drafting, executing, and filing a section 6229(b)(1)(B) authorization] are permissive and not mandatory'", so that a partnership "may use another method to authorize a person to extend * * * [the period of limitations]."[13]

Here, Mr. Hahn, on behalf of CMI, PIF's designated member-manager and TMP under the PIFOA, had the power to confer upon participant the authority to execute the Form 872-P consents, and he exercised that power by appointing him PIF's TMP.[14] His appointment of participant as PIF's TMP may have been fruitless to actually make participant PIF's TMP, see sec. 6231(a)(7); sec. 301.6231(a)(7)-1, Proced. & Admin. Regs., but the appointment expressed Mr. Hahn's intent to

---

[13]The same may be said of the final regulation, sec. 301.6229(b)-1, Proced. & Admin. Regs., which is effective for partnership taxable years beginning on or after October 4, 2001, i.e., for PIF's 2002-04 taxable years, and, with respect to the facts of this case, is identical, in all material respects, to the cited temporary regulation.

[14]Cf. Med. & Bus. Facilities, Ltd. v. Commissioner, 60 F.3d 207, 208, 210-211 (5th Cir. 1995) (general partner's authorization of the individual who signed the consents on behalf of the partnership to represent the partnership before the IRS was deemed ineffective where the partnership agreement required the managing general partner and a management committee to "act collectively on all decisions with respect to the management and control of the business"), rev'g T.C. Memo. 1994-38.

[*38] authorize participant to exercise the authority that, on behalf of CMI (as PIF's designated member-manager and TMP), Mr. Hahn could exercise, including the authority to execute the Form 872-P consents. The efficaciousness of Mr. Hahn's ostensible appointment of participant as PIF's TMP should be no less than Curtis' ostensible appointment of Montelius as sole general partner of Investment Engineers, Ltd., in his stead. Although both appointments may have been inefficacious to accomplish the stated purpose (i.e., designation of a TMP or creation of a general partner), both granted authority that was broad enough to permit the recipient to deal with the IRS on behalf of the partnership (or in this case, the LLC), including the authority to execute consents extending the period of limitations. Just as Curtis "authorized Montelius to assume the powers and responsibilities of a general partner", so too did Mr. Hahn authorize participant "to assume the powers and responsibilities of" PIF's TMP, which, pursuant to section 6229(b)(1)(B), included the power to execute the consents.[15]

---

[15]With regard to the efficacy of an individual's purported or ostensible authority to act as a partnership's TMP, the language of the Court of Appeals for the Ninth Circuit, in its unpublished opinion affirming our decision in Inv. Eng'rs, Ltd., discussing Montelius's ostensible authority to act as a general partner, is instructive:

> Thus, the Partnership, through its agent Curtis, led Claus [the IRS agent] to believe that Montelius was an agent of the Partnership with

(continued...)

**[*39]**                            (b)  Conclusion

Participant was authorized to execute the Form 872-P consents for 2001-04

on behalf of PIF.

> (3)    Whether Participant Is Estopped From Denying
>        His Authority To Execute the Form 872-P
>        Extensions

> (a)  Analysis

In Cascade P'ship v. Commissioner, T.C. Memo. 1996-299, 1996 WL

348214, we considered whether the partnership was estopped from denying an

individual partner's authority to execute a consent binding the partnership to an

extension of the period of limitations.  In that case, at the request of Walsh, the

nonpartner promoter and manager of the partnership, Costello, one of the partners,

---

[15](...continued)
the powers of general partner.  Given the fact that Montelius was, in
fact, acting as a general partner, Claus's reliance on Curtis's
representations was not unreasonable.  Because Montelius was an
agent of the Partnership with ostensible authority to act as general
partner, the broad grant of authority to general partners in the
Partnership Agreement provided him with the necessary written
authorization to sign consents under § 6229(b)(1)(B).

Montelius v. Commissioner, 145 F.3d 1339, 1998 WL 337955, at *2 (9th Cir.
1998), aff'g Inv. Eng'rs, Ltd. v. Commissioner, T.C. Memo. 1996-122.  Here,
because participant was, indirectly, an agent of PIF with ostensible authority to act
as its TMP, the grant of authority to TMPs, under sec. 6229(b)(1)(B), to sign
consents extending the period of limitations provided him with the necessary
written authorization to sign consents under that same provision.

[*40] signed a consent extending the limitations period for making assessments against the partnership.  He signed the consent on the line designated for the TMP rather than on the line designated for a representative of the partnership.  Thereafter, he dealt with the IRS in connection with its audit of the partnership as the partnership's TMP.  In response to the IRS' proposed adjustment and subsequent FPAA, the partnership filed a petition with this Court signed by Costello as TMP.  Almost five years after the petition was filed and the caption changed to reflect Mr. and Mrs. Costello as the partnership's TMP, the partnership moved to amend the petition in order to plead that the period of limitations had expired before the Commissioner's mailing of the FPAA to Mr. Costello.  Thereafter, both parties moved for partial summary judgment on the period of limitations issue.  Id., 1996 WL 348214, at *2.  We noted that

> Costello, although a general partner of Cascade, had not been expressly designated as Cascade's TMP, and he was not the partner with the largest partnership interest.  Costello held himself out as an agent of Cascade and permitted respondent to believe that he was Cascade's TMP.  Respondent's agents relied to their detriment on Costello's manifestation of authority to act as TMP on behalf of Cascade.  * * *

Id. at *3.

In holding that the partnership was estopped from denying Costello's authority to execute the consents as the ostensible TMP, we reasoned as follows:

**[\*41]** There is no question that Costello, Walsh, and the other partners were aware that respondent was acting on Costello's execution of documents, including the consent and correspondence with respondent. \* \* \* [I]t is clear that respondent did not know that Costello was not the appointed or qualified TMP and that Costello's representations were reasonably relied on to respondent's substantial detriment. Under these circumstances, we hold that Cascade is estopped to deny Costello's authority to execute a consent binding the partnership to an extension of the period for assessment.

Cascade P'ship v. Commissioner, 1996 WL 348214, at \*6.[16]

---

[16]In determining that Cascade was estopped from denying Costello's authority to execute the consent, we found the facts to be "distinguishable" from the facts in Med. & Bus. Facilities, Ltd. v. Commissioner, 60 F.3d 207, which declined to find that a partnership was estopped from arguing that the individual who signed the consents was not the TMP. See Cascade P'ship v. Commissioner, T.C. Memo. 1996-299, 1996 WL 348214, at \*6. Presumably, we distinguished Med. & Bus. Facilities, Ltd. on the ground that, unlike the facts in Cascade P'ship, in Med. & Bus. Facilities, Ltd. the IRS agent specifically advised one of the partners and the partnership's counsel to formally designate a TMP "or the IRS would designate one for it." In response, the partnership failed to file any statement with the IRS designating a TMP and, instead, merely furnished the agent with consents signed by the individual who had been internally authorized by one of the partners to deal with the IRS. Under those circumstances, the Court of Appeals determined that the IRS could not "reasonably rely on the representations of a third party as to the identity of a TMP." See Med. & Bus. Facilities, Ltd. v. Commissioner, 60 F.3d at 209, 212. The facts in this case are also distinguishable from those in Med. & Bus. Facilities, as Mr. Hahn, on behalf of CMI (PIF's member-manager), did fax to the agent a letter formally designating participant as PIF's TMP.

We also noted, in Cascade P'ship v. Commissioner, 1996 WL 348214, at \*6, that appeal was to the Court of Appeals for the Ninth Circuit, which had not addressed the "specific [estoppel] question." That is also true in this case as PIF's principal place of business (according to the San Francisco address listed on each of its returns for the years in issue) would also suggest that appeal of this case lies

(continued...)

**[\*42]** We find our analysis and conclusion with respect to the application of estoppel in Cascade P'ship to be persuasive, and we further find that the case for applying estoppel against participant is, if anything, more compelling than it was for applying that doctrine in Cascade P'ship. Here, not only did both Mr. Hahn, acting on behalf of CMI, PIF's manager, and participant hold the latter out as PIF's TMP during the entire period in which participant, acting in that capacity, signed Form 872-P consents on behalf of PIF, but Mr. Hahn also specifically advised respondent beforehand of his resignation as TMP and participant's appointment to that position. As in Cascade P'ship, respondent relied upon that advice to his substantial detriment by accepting the consents executed by participant as valid extensions of the periods of limitations for the years in issue. Moreover, respondent's reliance on Mr. Hahn's and participant's representations was reasonable under the circumstances. As in Cascade P'ship, it was "clear that respondent did not know" that participant was not a "qualified TMP". The reasonableness of respondent's belief is further confirmed by the tentative conclusion, expressed in the November 10, 2010, order, that, by virtue of his indirect membership interest in PIF, which made him a partner in PIF pursuant to

---

[16](...continued)
to the Court of Appeals for the Ninth Circuit pursuant to sec. 7482(b)(1)(E).

[*43] section 6231(a)(2)(B), "[a]pparently, Mr. Tsai was entitled to become the TMP of PIF".

## (b) Conclusion

Participant is estopped from denying his authority as PIF's ostensible TMP to execute the Form 872-P consents for the years in issue.

### 3. Conclusion

The Form 872-P consents that participant signed for 2002-04 were valid to extend the periods of limitations to December 31, 2008, for those years; and, assuming the initial consent that Mr. Hahn signed for 2001 was timely, the Form 872-P consents that participant signed for that year were similarly valid.

## III. Respondent's Motion

As noted supra, respondent's motion asks us to determine that (1) by virtue of the Form 872-I consents executed by the Tsais for 2001-03, the FPAA was timely with respect to them for those taxable years and (2) by virtue of Mr. Tsai's execution of a Form 872-P consent for 2004, the FPAA was timely with respect to him for that taxable year. In both cases the timeliness issue relates to respondent's right to assess deficiencies attributable to Mr. Tsai's distributive share of PIF's partnership items for those years.

[*44] Our determination that the FPAA was timely for 2002-04 with respect to all of PIF's partners, by virtue of the Form 872-P consents that participant executed, renders moot the issue of whether participant's execution of (1) Forms 872-I for 2002 and 2003 and (2) a Form 872-P for 2004 was effective to extend the period of limitations applicable to assessments against the Tsais or participant alone with respect to participant's distributive share of PIF's partnership items for those years. However, because the timeliness of the initial Form 872-P consent for 2001, executed by Mr. Hahn, remains unresolved, the issue regarding the validity of the Tsais' Form 872-I consent for 2001 is not moot at this time.

Participant's claim that the Tsais' Form 872-I consents (including the one they executed for 2001) are invalid rests solely on his claim of respondent's alleged misconduct, which, participant argues, should be the basis for holding that respondent "is equitably estopped from relying on any agreement with participant [including the Form 872-I consents] to validate the untimely FPAA." Because we have found that respondent was not guilty of any misconduct that would justify the application of either judicial or equitable estoppel to him, see discussion supra section I.B.2.a., we reject participant's attack on the validity of his Form 872-I consents for 2001 and hold that they effectively extended the period of limitations to December 31, 2008, with respect to respondent's right to make assessments

[*45] against the Tsais attributable to participant's distributive share of PIF's partnership items for 2001. Therefore, the FPAA was timely issued, on December 30, 2008, with respect to those items.

<u>An appropriate order will be issued granting in part respondent's cross-motion and denying participant's motion for summary judgment</u>.